```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
                Civil No. 13-1870(DSD/JJK)
```

Brotherhood Mutual Insurance
Company as subrogee of Mound
Evangelical Free Church, and
Mound Evangelical Free Church,

           Plaintiffs,

v.                                                                   **ORDER**

ADT, LLC of Delaware d/b/a ADT
Security Services, a Delaware
corporation, and Tyco Fire Products,
d/b/a Tyco Fire Suppression & Building
Products, a Delaware corporation,

           Defendants.

      Jessica L. Boyle, Esq. and Hanson, Lulic & Krall, LLC,
      700 Northstar East, 608 Second Avenue South, Minneapolis,
      MN 55402, counsel for plaintiffs.

      Sarah L. Baltzell, Esq. and Shook, Hardy & Bacon, LLP,
      2555 Grand Boulevard, Kansas City, MO 64108 and Michael
      R. Docherty, Esq., 7713 Glasgow Drive, Edina, MN 55439,
      counsel for defendants.

      This matter is before the court upon the motions for summary judgment by defendants ADT, LLC of Delaware, d/b/a ADT Security Services (ADT)[1] and Tyco Fire Suppression & Building Products (Tyco) (collectively, defendants) and the motion to exclude expert

---

[1] Tyco Integrated Security LLC, formerly known as ADT Security Services, argues that ADT, LLC was improperly named in this matter. See ECF No. 63, at 1. For consistency, however, the court refers to the defendants as they are reflected in the case caption.

testimony by Tyco.  Based on a review of the file, record and proceedings herein, the court grants the motion to exclude expert testimony and the motions for summary judgment.

**BACKGROUND**

This property-damage dispute arises out of water damage to the building of plaintiff Mound Evangelical Free Church (Mound Evangelical).  On July 6, 2012, a sprinkler head activated and flooded parts of Mound Evangelical. Am. Compl. ¶ 5.  The sprinkler head was designed, manufactured and sold by Central Sprinkler Company, which was subsequently acquired by Tyco.  Docherty Aff. Ex. C, ECF No. 75, at 1-2.  The sprinkler head was designed to release water upon reaching 155 degrees and was not intended for installation in areas with ambient temperatures above 100 degrees. See id.

The sprinkler head was installed near the top of the vaulted sanctuary of the church building, approximately 30 feet above the floor.  Ofori-Amanfo Dep. 33:21-34:2.  The sanctuary was air-conditioned only during weekend church services.  See Abernethy Dep. 13:14-20.  Weather conditions in Mound, Minnesota around the time of the incident reached about 102 degrees Fahrenheit. Ofori-Amanfo Dep. 29:24-30:17; Peterson Dep. 29:8-9.

ADT provided security and monitoring services for Mound Evangelical pursuant to a written contract (Contract). Am. Compl.

¶ 3. On July 6, 2012, the Mound Evangelical alarm system sent two signals to ADT, a "low air" signal followed one minute later by a "restore" signal. Docherty Aff. Ex. A, ECF No. 64, at 3.  Later that evening, an ADT representative contacted Mound Evangelical trustee Mark Peterson, informed him that it had received notification of the alarms and stated that no action was required of Peterson.  See Peterson Dep. 20:10-14.  On July 7, 2012, ADT received notification of a "waterflow" signal and alerted the fire department. Docherty Aff. Ex. A, ECF No. 64, at 2.  The sprinkler head at issue had activated and flooded parts of the church building, causing extensive damage.  Peterson Dep. 28:9-20. Plaintiff Brotherhood Mutual Insurance Company (Brotherhood) compensated Mound Evangelical for the damage as provided for by its insurance contract with Mound Evangelical.  Am. Compl. ¶ 2.

On October 28, 2013, Brotherhood, as subrogee of Mound Evangelical, filed an amended complaint, alleging negligence claims against ADT and a products liability claim against Tyco. Brotherhood thereafter retained Matt Doughty and Kent Jones, registered Professional Engineers employed by Encompass, Inc., as experts to testify in support of its claims.  See Boyle Aff., ECF No. 82, Ex. C.  On November 12, 2013, ADT moved to dismiss the amended complaint.  On March 4, 2014, the court notified ADT that it would construe its motion as a motion for summary judgment.  See

3

ECF No. 59. Tyco then moved for summary judgment and to exclude the expert testimony of Doughty and Jones.

## DISCUSSION

### I. Expert Testimony

Tyco moves to exclude the testimony of Doughty and Jones. "[T]he admissibility of expert testimony in diversity cases is governed by federal law." Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) (citation omitted). The court "must ensure that all scientific testimony is both reliable and relevant." Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir. 2006) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 580 (1993)). "To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." Id. at 757-58 (citation omitted).

#### A. Qualifications

Tyco first argues that Doughty and Jones are not qualified to offer expert testimony. Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized

> knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, the court acts as a gatekeeper to determine "whether the witness is qualified to offer expert testimony." Schmidt v. City of Bella Villa, 557 F.3d 564, 570 (8th Cir. 2009) (citations omitted). This standard is satisfied when the expert's testimony "advances the trier of fact's understanding to any degree." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) (citation and internal quotation marks omitted). Rule 702 nonetheless requires that "the area of the witness's competence matches the subject matter of the witness's testimony." Id. at 1101 (citation and internal quotation marks omitted).

Here, Tyco argues that Doughty and Jones have no prior experience in (1) analyzing sprinkler head design and installation and (2) diagnosing defects related to improper sprinkler activation. The court agrees. Doughty and Jones are both registered Professional Engineers. See Boyle Aff. Ex. C, ECF No. 82, at 4-5. Doughty's experience, however, relates to conveyor processes, HVAC systems and "piping and plumbing designs." See id. at 4. Jones has experience in various forms of structural design and analysis. See id. at 5. Both individuals have experience in piping systems and some aspects of structural engineering, although

5

Brotherhood does not address how such experience is relevant to sprinkler head activation. See id. Ex. E, ¶ 4; id. Ex. F, ¶ 7.

Neither Doughty nor Jones has prior experience relating to sprinkler heads. See Jones Dep. 19:3-5; 92:3-7. Similarly, neither individual has previously investigated a premature sprinkler head activation under circumstances similar to the instant dispute. See Doughty Dep. 49:15-20; Jones Dep. 25:20-25. No evidence before the court suggests that either individual is trained, experienced or educated in sprinkler head system activation or defect diagnosis. See Anderson v. Raymond Corp., 340 F.3d 520, 523 (8th Cir. 2003) (noting that "[e]ven though some engineering principles can be applied universally," engineering expert's opinion should be excluded where expert had never designed or consulted on design of the product in question). In sum, Brotherhood does not meet its burden to show that sprinkler head activation is within the experience and knowledge of Doughty or Jones. See e.g., Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715 (8th Cir. 2001) (finding expert testimony excludable where proponent who was qualified in some areas related to the underlying claims "lacked the education, employment, or other practical personal experiences to testify as an expert specifically regarding" the key matter at issue). As a result, for this reason alone, the court grants the motion to exclude the testimony of Doughty and Jones.

**B.    Methodology**

Even if Doughty and Jones were qualified to offer such testimony, Tyco argues that the methodology they employed in formulating their expert opinion renders such testimony unreliable. The court agrees. The court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Schmidt, 557 F.3d at 570 (citations and internal quotation marks omitted). The court considers several nonexclusive factors when determining the reliability of an expert's opinion, including:

> (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; ... (4) whether the theory has been generally accepted; ... [(5)] whether the expertise was developed for litigation or naturally flowed from the expert's research; [(6)] whether the proposed expert ruled out other alternative explanations; and [(7)] whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

Lauzon v. Senco Prods., Inc., 270 F.3d 681, 687 (8th Cir. 2001) (citations and internal quotation marks omitted). This "flexible and fact specific" inquiry allows the court to "use, adapt, or reject [the] factors as the particular case demands." Unrein, 394 F.3d at 1011 (citation omitted). "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." Lauzon, 270 F.3d at 686 (citation omitted).

7

Here, consideration of these factors weighs in favor of exclusion.  First, the report produced by Doughty and Jones fails to sufficiently connect the proposed testimony with the facts of the case.  For example, the applicable industry guidelines suggest that the sprinkler head should not be installed in a location with a ceiling temperature exceeding 100 degrees.  See Doughty Dep. 108:1-109:24; Jones Dep. 63:4-64:6.  The joint report produced by Doughty and Jones, however, failed to examine whether the ceiling temperature exceeded 100 degrees on the date of the activation. See Doughty Dep. 114:19-22.

Further, Tyco argues that Doughty and Jones failed to properly rule out alternative explanations.  Brotherhood responds that the report considered alternative causes and, after an evaluation of the plausibility of each cause, properly concluded that a product defect "likely caused the sprinkler head to activate."  Boyle Aff. Ex. C, ECF No. 82, at 3.  In certain cases, such a "differential diagnosis satisfies Daubert and provides a valid foundation for admitting an expert opinion." Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1208 (8th Cir. 2000).  As a threshold matter, Brotherhood points to no authority stating that differential diagnoses apply to a non-medical expert's testimony.  See, e.g., Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir. 1999) (defining differential diagnosis as "a standard scientific technique of identifying the cause of a medical problem by

eliminating the likely causes until the most probable one is isolated" (citation omitted)); see also Bland v. Verizon Wireless, (VAW) L.L.C., 538 F.3d 893, 897 (8th Cir. 2008).

Here, even if a differential analysis is applicable to the instant facts, such an analysis must employ an appropriate methodology to be considered reliable. "A differential diagnosis involves the systematic ruling out of other possible causes." Stevens v. City of Virginia, No. 99-1033, 2001 WL 391568, at *4 (D. Minn. Mar. 29, 2001) (citation omitted). The joint report, however, does not reveal anything systematic about the manner in which alternative potential causes were excluded. As already explained, Doughty and Jones did not consider that temperatures between 100 and 155 degrees may have contributed to the activation. Similarly, the joint report did not explain the basis on which tampering or physical damage was excluded as a possible cause. Such omission is particularly problematic given the observable damage to the support cup of the sprinkler head. See Docherty Aff. Ex. C, ECF No. 75, at 8. Nor did the joint report discuss corrosion or installation problems, two factors later acknowledged as having the potential to cause activation, as possible reasons for the sprinkler head activation. See Doughty Dep. 114:10-18; Jones Dep. 66:1-3. Finally, the report was developed for litigation and did not naturally flow from expert research. "An expert's finding that flows from research independent of litigation

is less likely to be biased and the expert is limited to the degree to which he can tailor his testimony to serve a party's interests." <u>Lauzon</u>, 270 F.3d at 692 (citation and internal quotation marks omitted). As a result, the report of Doughty and Jones is not sufficiently reliable for the purposes of Rule 702 and, for this additional reason, exclusion is warranted.

**II.  Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. <u>See</u> <u>id.</u> at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. <u>See</u> <u>id.</u> at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 324. A party asserting that a genuine dispute exists – or cannot exist – about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P.

56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

### A. Tyco

Brotherhood asserts a products liability claim against Tyco based on theories of negligence and breach of warranty. Under Minnesota law, in a products liability case alleging defective design, such theories of recovery "merge into one theory for consideration." Bilotta v. Kelley Co., 346 N.W.2d 616, 622 (Minn. 1984). To recover on the products liability claim, Brotherhood must establish that the sprinkler was in "a defective condition unreasonably dangerous for its intended use." Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1009 (8th Cir. 1998) (applying Minnesota law) (citations and internal quotations omitted).

Tyco argues that, given the exclusion of the joint report by Doughty and Jones, there is no evidence in the record that demonstrates any defect associated with the sprinkler head. Brotherhood responds that a genuine issue of material fact remains because it can establish a defect on the basis of res ipsa loquitur. In general, a res ipsa loquitur plaintiff must demonstrate that "(1) the accident in question was the kind that does not occur without someone's negligence; (2) at the time of the

11

injury, the instrumentality causing the accident was in the exclusive control of the defendant; and (3) the condition which resulted in the injury was not due to the conduct of the plaintiff or some third party." Mozes v. Medtronic, Inc., 14 F. Supp. 2d 1124, 1128-29 (D. Minn. 1998) (citations omitted). "If the accident may reasonably be attributable to one or more causes for which defendant is not responsible, the doctrine does not apply." Id. at 1129 (citation omitted). Further, "[i]n Minnesota res ipsa loquitur alone cannot make out a products liability case." Trost, 162 F.3d at 1009 (citation omitted). In other words, a plaintiff seeking to invoke res ipsa loquitur in a products liability case must introduce "something more than evidence that the accident occurred in order to prove defect and causation," which may be in the form of proper expert testimony or other circumstantial evidence. Rohwer v. Fed. Cartridge Co., No. 03-2872, 2004 WL 2677200, at *3 (D. Minn. Nov. 18, 2004) (citations and internal quotation marks omitted).

Here, Brotherhood fails to establish that the doctrine of res ipsa loquitur applies. First, the improper activation of sprinkler heads does not typically occur only due to negligence, as even Brotherhood recognized numerous other potential causes of sprinkler head activation. See, e.g., Boyle Aff. Ex. C, ECF No. 82, at 3 (identifying alternative reasons for which a sprinkler head may improperly activate); see also Doughty Dep. 114:6-16 (identifying

12

various reasons for improper activation other than negligence). Moreover, as already explained, exclusion of the testimony of Doughty and Jones is warranted, and no other evidence before the court suggests the presence of a defect. Rather, the record demonstrates that the sprinkler head was tested and subjected to various quality control measures prior to its installation. See Docherty Aff. Ex. C, ECF No. 75, at 4. As a result, no reasonable jury could find that the sprinkler head was in a defective condition unreasonably dangerous for its intended use, and summary judgment as to Tyco is warranted.

    **B.   ADT**

ADT argues that summary judgment is warranted because its duties to Mound Evangelical arose solely from the contract between the parties and that a breach of that contract cannot support a tort claim. In Minnesota, "a party is not entitled to recover tort damages for a breach of contract, absent an exceptional case where the breach of contract constitutes or is accompanied by an independent tort." Cherne Contracting Corp. v. Wausau Ins. Cos., 572 N.W.2d 339, 343 (Minn. Ct. App. 1997) (citation and internal quotation marks omitted). Brotherhood responds that ADT received a notification of the alarm and its "wrongful conduct thereafter in contacting the [c]hurch, placed [its] actions outside of the written contract between the parties." Am. Compl. ¶ 12. Specifically, Brotherhood argues that the statements to Peterson

exceeded the contractual obligations undertaken by ADT and constituted gross negligence or willful and wanton negligence.

A tort is independent from a breach of contract if "a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself." Hanks v. Hubbard Broad., Inc., 493 N.W.2d 302, 308 (Minn. Ct. App. 1992) (citation omitted). In other words, although a contract between parties generally forms the basis for their legal relationship, where a party acts beyond the boundaries of the contract and voluntarily assumes duties not contained therein, a claim may sound in tort. See Isler v. Burman, 232 N.W.2d 818, 822 (Minn. 1975) ("It is well established that one who voluntarily assumes a duty must exercise reasonable care or he will be responsible for damages resulting from his failure to do so.").

Here, the Contract provides that "[i]f an alarm signal registers at [ADT]..., ADT will endeavor to notify the appropriate Police or Fire Department and ... the Customer's designated representative." See Mem. Supp. Ex. A, ECF No. 36, at 3. The contract expressly describes the boundaries of ADT's contractual obligations toward Mound Evangelical, specifying that ADT would undertake to *notify* Mound Evangelical of alarm signals but would not *advise* Mound Evangelical of how to respond to any signals. Brotherhood argues, however, that ADT exceeded its contractual obligations and voluntarily assumed a duty beyond that which was

14

provided for in the contract.[2]  Even if ADT exceeded its contractual obligations, however, the valid and enforceable exculpatory provision in the Contract nonetheless warrants summary judgment for ADT.

   **1.  Exculpatory Clause**

ADT argues that the exculpatory clause[3] in the Contract bars Brotherhood's tort claim.  Brotherhood responds that ADT was grossly negligent or willfully and wantonly negligent, and that under Minnesota law, exculpatory clauses that seek "to release the

---

[2]  Under Minnesota law,

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965); see also Funchess v. Cecil Newman Corp., 632 N.W.2d 666, 675 (Minn. 2001) (applying § 323).

[3]  The contract provides, in relevant part:

> E. Limitation of Liability ... (2)  ... ADT shall have no liability for loss[,] damage or injury due directly or indirectly to events, or the consequences therefrom, which the System or Services are intended to detect or avert ....  (4) The provisions of this Section E shall apply no matter how the loss, damage or injury or other consequence occurs, even if due to ADT's ... negligence, active or otherwise ... or any other alleged fault on the part of ADT, its agents or employees.

Mem. Supp. Ex. A, ECF No. 36, at 5.

15

benefited party from liability for intentional, willful or wanton acts ... will not be enforced." Schlobohm v. Spa Petite, Inc., 326 N.W.2d 920, 923 (Minn. 1982). "Specifically, the Minnesota Supreme Court has explained exculpatory clauses do not violate public policy when applied to claims of ordinary negligence, but do violate public policy, and are therefore unenforceable, against claims of willful and wanton negligence." Gage v. HSM Elec. Prot. Servs., Inc., 655 F.3d 821, 825 (8th Cir. 2011) (citation and internal quotation marks omitted).

As an initial matter, the exculpatory clause is valid and enforceable as to Brotherhood's claims of ordinary negligence. See Ball v. Waldoch Sports, Inc., No. C0-03-227, 2003 WL 22039946, at *3-4 (Minn. Ct. App. 2003) (collecting cases and finding that exculpatory clause limiting liability from claims "whether caused by the negligence ... or otherwise" was valid and enforceable). Thus, the claim for ordinary negligence against ADT is barred by the exculpatory clause. As a result, Brotherhood can survive summary judgment only if a reasonable fact finder could conclude that ADT's actions or omissions amounted to gross negligence or willful and wanton negligence, such that the exculpatory clause does not apply. See Gage, 655 F.3d at 827 (citation omitted).

### a. Willful and Wanton Negligence

"Willful and wanton negligence is reckless disregard of the safety of the person or property of another by failing, after

16

discovering the peril, to exercise ordinary care to prevent the impending injury." Hinkle v. Minneapolis, A.&C.R. Ry. Co., 202 N.W. 340, 340 (Minn. 1935) (citations omitted). "[A] willful or wanton act is one done with a consciousness of probable results but with reckless indifference to them." Mueller v. Dewey, 198 N.W. 428, 429 (Minn. 1924) (citation omitted).

Here, ADT received two signals from the Mound Evangelical alarm system on July 6, 2012: (1) a "low air" signal at 7:46 p.m. indicating that air pressure in the sealed pipes of the dry sprinkler system had fallen below a specified threshold and (2) a "restore" signal at 7:47 p.m. indicating that air pressure had been restored. See Docherty Aff. Ex. A, ECF No. 64, at 3.  ADT argues that "[i]f the operator does not see multiple low air signals, it means the system's air pressure was restored" and that its operator understood the system to be functioning properly. Id. at 4. Moreover, ADT notes that it "is not an uncommon occurrence to see a 'low air' signal followed by a 'restore' signal." Id. Brotherhood does not adduce any evidence from which a reasonable jury could conclude that the ADT representative - given the proffered interpretation of the two signals - had any "knowledge or consciousness ... of the peril" at issue. Raths v. Sherwood, 262 N.W. 563, 566 (Minn. 1935). In other words, Brotherhood cannot demonstrate that ADT had any "consciousness of [the] probable result[]" that the church would sustain damage, much less that ADT

was recklessly indifferent to such a result. See Mueller, 198 N.W. at 429; see also Bryant v. N. Pac. Ry. Co., 23 N.W.2d 174, 181 (Minn. 1946) ("Wil[l]ful and wanton negligence cannot be predicated upon honest misjudgment." (citation omitted)). As a result, no reasonable jury could conclude that ADT acted willfully or wantonly and the claim premised on willful or wanton negligence fails.

### b. Gross Negligence

ADT next argues that summary judgment is warranted on the gross negligence claim. "Gross negligence is very great negligence or absence of even slight care, but [it is] not equivalent to wanton and willful conduct." Beehner v. Cragun Corp., 636 N.W.2d 821, 829 (Minn. Ct. App. 2001) (alteration in original) (citation and internal quotation marks omitted). Here, Brotherhood has adduced no evidence that ADT's actions reflected an "absence of even slight care" or were "egregious enough to fall into [the] public policy exception that prohibits the limitation of liability for willful or gross negligence." Am. Litho, Inc. v. Imation Corp., No. 08-5892, 2010 WL 681298, at *6 (D. Minn. Feb. 23, 2010) (citation omitted) (Nelson, M.J.). As already explained, the record instead suggests that ADT followed its internal procedures for responding to the alarm signals, even if its communication to Peterson arguably did not expressly follow the language of the Contract. Moreover, Brotherhood does not argue that ADT failed to report additional signals or other irregular readings that would

18

have merited further communications to Mound Evangelical.  <u>See</u> Docherty Aff. Ex. A, ECF No. 64, at 4 (describing typical process followed by ADT upon receiving "low air" and "restore" signals in quick succession).  In sum, the alleged communication, without more, is insufficient to show that ADT's conduct was grossly negligent.  As a result, no reasonable jury could conclude that ADT's actions were grossly negligent or willfully and wantonly negligent and summary judgment is warranted.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

    1.   The motion to dismiss by defendant ADT [ECF No. 35] is construed as a motion for summary judgment and is granted;

    2.   The motion to exclude expert testimony [ECF No. 66] is granted;

    3.   The motion for summary judgment by defendant Tyco [ECF No. 72] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  July 2, 2014

                                                  <u>s/David S. Doty</u>
                                                  David S. Doty, Judge
                                                  United States District Court